## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

     v.                                  Cr. No. 21-253 KWR

JEFFREY CANNON,

       Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

Bernalillo County Sheriff's Office Deputies stopped Defendant Jeffrey Cannon just outside the front door of his apartment in connection with two minor traffic violations. When the Deputies informed Mr. Cannon that they were going to frisk him, Mr. Cannon attempted to flee into his apartment. The Deputies followed him, arrested him, searched him, and found a gun in his possession. Mr. Cannon, a convicted felon, seeks to suppress evidence of this gun and of statements he made in connection with the gun.

The Deputies' initial stop of Mr. Cannon was lawful. They had probable cause to believe he committed traffic violations and they had not entered curtilage of his property at the time of their initial stop. However, because evidence at the time did not exist to support probable cause that Mr. Cannon had committed a felony, or even a serious misdemeanor, the Deputies violated Mr. Cannon's Fourth Amendment rights when they followed him into his home without a warrant. As a result, I recommend that the Court GRANT Defendant Jeffrey Cannon's Motion To Suppress Evidence And Memorandum In Support Thereof, filed April 8, 2021 (Doc. 39). Because the granting of this motion requires the suppression of the same statements at issue in

Defendant Jeffrey Cannon's Motion To Suppress Statements And Memorandum In Support Thereof, filed April 8, 2021 (Doc. 40), I recommend denying that motion as moot.[1]

## **BACKGROUND**

The following facts are undisputed except where noted.[2] On November 20, 2020, at 8:47 a.m., Bernalillo County Sheriff's Office ("BCSO") Detective Nicholas S. Aragon was on patrol in an unmarked vehicle near the intersection of Texas and Copper N.E., an area of town known as Albuquerque's International District. Doc. 39 at 4; Doc. 42 at 1. Deputy Aragon is assigned to the Community Action Team ("CAT") and Gang Recognition Intelligence Patrol ("GRIP"). *Id.* CAT and GRIP are specialized units that consist of BCSO detectives who focus on investigations involving drugs, auto theft, property crimes, and gangs. Doc. 42 at 1.

Detective Aragon observed a man, identified later as the defendant, Jeffrey Cannon, riding a blue scooter. *Id.* Detective Aragon did not previously know Mr. Cannon. *Id.* Mr. Cannon was wearing a big black puffy jacket that concealed his waistband. *Id.* The scooter had no visible license plate and appeared to be sprayed with blue paint. *Id.* Detective Aragon immediately found this suspicious because, in his experience, the blue spray paint indicated that the scooter may have been stolen. *Id.* Detective Aragon observed the scooter travel on the sidewalk briefly.

---

[1] Pursuant to 28 U.S.C. § 636(b)(1)(A), United States District Judge Kea W. Riggs referred these motions to me to conduct hearings, if warranted, and to perform any legal analysis required to recommend an ultimate disposition of the case. Doc. 53. I held an evidentiary hearing on the motions on May 19, 2021. Doc. 56 (clerk's minutes); Doc. 59 (hearing transcript). With permission of the Court, both parties filed supplemental briefs addressing legal issues discussed at the evidentiary hearing. Docs. 57, 58.

[2] The interaction Deputies Chavez and Feist had with Mr. Cannon from just before Mr. Cannon pulled into his driveway until he began to enter his apartment is captured on a video recording and the conversation the Deputies had with Mr. Cannon during this time is captured on an audio recording. Thus, the events that unfolded during this time frame leave little room for factual dispute.

*Id.*[3] Detective Aragon then observed Mr. Cannon stop in the middle of the roadway and, in Detective Aragon's opinion, engage in conduct consistent with a hand-to-hand drug transaction with a woman parked in a green sedan. *Id.* More specifically, Mr. Cannon briefly reached his hand into the driver's window and pulled his hands back out, in very quick sequence. Doc. 59 at 28:10-13.

Detective Aragon used his radio to request law enforcement assistance. Doc. 42 at 1. Deputies Taylor Feist and Leroy Chavez were patrolling near the area. Doc. 39 at 1; Doc. 42 at 2. They responded to Detective Aragon's request for assistance. Doc. 42 at 2. Detective Aragon informed Deputy Chavez and Deputy Feist that Detective Aragon had just observed Mr. Cannon conduct a "hand-to-hand." Doc. 59 at 82:3-14. Detective Aragon also informed Deputy Chavez and Deputy Feist that Mr. Cannon was riding a scooter on the sidewalk. Doc. 42 at 2. Deputy Chavez and Deputy Feist arrived on the scene and observed Mr. Cannon riding his scooter headed southbound. *Id.*

Deputies indicated they observed the moped scooter make a U-turn and drive into 417 Texas N.E. Doc. 39 at 2. At the same time as the Deputies initiated a stop of Mr. Cannon, Detective Aragon observed what he believed was a second hand-to-hand transaction between an unidentified male and the driver of the green sedan. Doc. 59 at 46. That is, Detective Aragon observed a second unidentified male approach the same green sedan. *Id.* at 46:1-7. The second male walked up to the driver's side door, reached into the window, and walked away very soon thereafter. *Id.* at 47:1-3. Detective Aragon could not specifically see what was in anybody's

---

[3] Mr. Cannon disputes that he was riding on the sidewalk. Doc. 51 at 2. I address the credibility of Detective Aragon's testimony in the Discussion section.

hands. *Id.* at 67:10. In Detective Aragon's experience, hand-to-hand drug transactions typically involve small quantities of drugs. *Id.* at 74:22-75:3.

When Deputies Feist and Chavez observed Mr. Cannon pull into the parking lot of the apartment, they initiated the lights of their patrol vehicle, but Mr. Cannon did not stop immediately. Doc. 59 at 86. When Deputies Feist and Chavez left their patrol vehicle to approach Mr. Cannon, he had parked the moped in his front porch area and was turning it off. Doc. 39 at 2. Deputy Feist directed Mr. Cannon to stop and talk to her. *Id.* Mr. Cannon was standing on his apartment's front porch and had his hand on his front doorknob when he told Deputy Feist that he lived right there. *Id.* He was visible to the public while standing at this location. Doc. 59 at 99:6-12. During this conversation, the Deputies were standing on a sidewalk that also served as a pathway to other apartment complexes. *Id.* at 101:3-12, 190:17-23, 192:20-21. There was no fence or boundary separating the front door of Mr. Cannon's apartment and the public area. *Id.* at 99:16-19.

Deputy Feist asked Mr. Cannon for his identification. Doc. 39 at 2; Doc. 41 at 3. Mr. Cannon replied he lived right there and that was his home. *Id.* Deputy Feist told Mr. Cannon she was going to pat him down and asked if that was okay. *Id.* Mr. Cannon responded "Wait," and asked why he was going to be patted down and if Deputies had a warrant for him. *Id.* Deputy Feist told Mr. Cannon they did not need a warrant and advised Mr. Cannon the Deputies were "stopping" him because he was driving on the sidewalk. *Id.*

Mr. Cannon responded that he was not driving on the sidewalk. *Id.* Deputy Chavez disagreed, then asked him again if he had anything on him. *Id.* Mr. Cannon stated, "You can't touch me unless you have a warrant." *Id.* Deputy Chavez told Mr. Cannon that they did not need a warrant and said, "I'm going to make sure you don't have any weapons on you." *Id.*; Doc. 59 at

90:11-12. Mr. Cannon called out for his fiancée and knocked on his front door; his fiancée

opened the door; and Mr. Cannon walked into his apartment. Doc. 39 at 2; Doc. 41 at 33.[4] The

deputies prevented Mr. Cannon from closing the door and followed him into his home. *Id.* Mr.

Cannon refused to allow deputies to arrest him; an altercation ensued. Doc. 39 at 2; Doc. 42 at 3-

4. Eventually, the deputies took Mr. Cannon into custody. Doc. 39 at 2.

## DISCUSSION

Mr. Cannon filed two separate motions to suppress. The first raises a variety of Fourth

Amendment arguments and seeks to suppress all evidence against him that was obtained on the

day of his arrest. The second asserts that, although police provided a *Miranda* advisement, Mr.

Cannon never waived his right to remain silent and, therefore, his post-arrest statements should

be suppressed. I address these motions in turn.

**I.      Motion to Suppress All Evidence (Doc. 39)**

Mr. Cannon moves to suppress all evidence the police officers seized on November 20,

2020, the day of his arrest. Doc. 39 at 1. He argues that the officers did not have reasonable

suspicion to stop him and frisk him for a traffic violation, *id.* at 3-5; that all evidence

subsequently found on his person is a fruit of the unlawful frisk, *id.* at 5-7; that the officers

lacked probable cause to arrest him when they seized him on his front porch, *id.* at 9-11; and that

the officers entered the curtilage of his home and his home without a warrant, probable cause, or

exigent circumstances, *id.* at 9 & 11-16.

---

[4] There was some testimony at the evidentiary hearing that Mr. Cannon ran, rather than walked, into his apartment. The video shows the deputies quickly closed the distance between themselves and Mr. Cannon as Mr. Cannon began to enter his apartment. Whether Mr. Cannon was walking or running once he entered his apartment is outside of the camera's view. Running from police officers is more indicative of consciousness of guilt than simply walking away under the mistaken belief there are no grounds for a legal detention. Even assuming Mr. Cannon was running, however, I conclude that the Deputies' warrantless entry was unlawful.

In response, the United States maintains that reasonable suspicion justified a pat-down search, Doc. 41 at 6-8; that Mr. Cannon was not seized on his front porch because he did not submit to the officers' show of authority, *id.* at 9-10; that the officers had probable cause to arrest him for disobeying a lawful order to submit to the pat-down search, *id.* at 10-11; even if they did not have probable cause, they committed a reasonable mistake of law, *id.* at 12-13; and that the officers lawfully entered Mr. Cannon's home because they were in "hot pursuit" of a fleeing suspect, *id.* at 13-15.

I reject Mr. Cannon's arguments related to police conduct that occurred during their *Terry* stop and before their warrantless entry. However, I also reject the government's argument that the "hot pursuit" and "destruction of evidence" doctrines justify the warrantless entry into Mr. Cannon's home. The "hot pursuit" and "destruction of evidence" doctrines only apply when there is probable cause to believe a serious crime has been committed, the seriousness of which justifies the pursuit into the home in addition to the pursuit of a suspect or concerns about the destruction of evidence. *United States v. Aquino*, 836 F.2d 1268, 1272 (10th Cir. 1988); *Mascorro v. Billings*, 656 F.3d 1198, 1209 (2011). Under Tenth Circuit precedent, minor traffic violations and resisting or evading an officer are not serious crimes. I further find that misdemeanor possession of an illegal drug is not a serious crime for purposes of an *Aquino* analysis. Because police violated Mr. Cannon's Fourth Amendment rights when they entered his home without a warrant, I recommend granting Mr. Cannon's motion to suppress all evidence.

A.    The Deputies conducted a valid *Terry* stop of Mr. Cannon.

Mr. Cannon argues that Deputies Chavez and Feist conducted an illegal *Terry* frisk because they had no reasonable suspicion that he possessed a dangerous weapon. Mr. Cannon's argument fails, however, because the Deputies never conducted a *Terry* frisk. Instead, they conducted a lawful *Terry* stop and when they informed Mr. Cannon that they intended to frisk

him, Mr. Cannon attempted to flee. As a result, the Deputies did not frisk Mr. Cannon until after

they placed him under arrest. Because Mr. Cannon's argument relates to a frisk that never

occurred, the Court should reject his argument.

Had the Deputies actually frisked Mr. Cannon before he fled, whether they had

reasonable suspicion to do so would be a close question. Mr. Cannon argues that a detention for

a minor traffic violation did not give the officers the right to order Mr. Cannon to submit to a pat-

down search. Doc. 39 at 3-4. At the evidentiary hearing, Mr. Cannon emphasized that the

officers did not have an articulable basis to believe that he was armed or dangerous because they

did not have any information about him other than the minor traffic violations and a "hunch"

about a hand-to-hand drug transaction. Doc. 59 at 183-84.

Mr. Cannon relies on *United States v. Drakeford*, in which the Fourth Circuit held that a

"handshake," without more information such as testimony that the detective "witnessed drugs or

money change hands," did not establish reasonable suspicion to believe that a hand-to-hand drug

transaction had taken place. 992 F.3d 255, 264 (4th Cir. 2021). By contrast, the Tenth Circuit has

held that any "connection with drug transactions" can support a reasonable suspicion that a

suspect is armed and dangerous, justifying a pat-down search. *United States v. Garcia*, 459 F.3d

1059, 1064 (10th Cir. 2006). In *Garcia*, the police came to suspect an apartment of being used

for regular drug transactions, and Mr. Garcia was found inside that apartment when the police

entered. *Id.* at 1065-66. The pat-down search of Mr. Garcia was legal even though the police

knew nothing else about him. *Id.* at 1066. Similarly, in the present case, police had reason to

believe Mr. Cannon engaged in a drug transaction with the driver of the green sedan. Thus,

*Garcia* lends support to the argument that evidence Mr. Cannon had just engaged in a drug deal

provided reasonable suspicion to believe he was armed and dangerous, even though the Deputies

knew nothing else about him. The evidence of drug trafficking in *Garcia*, however, was stronger than in the present case, which could serve to distinguish *Garcia*. The Court need not decide whether *Garcia* is distinguishable, however, because regardless of whether the frisk the Deputies *intended* to conduct would be legal, the Deputies did not actually conduct that frisk.

The Deputies did seize Mr. Cannon and Mr. Cannon did submit to such seizure while he spoke to the Deputies.[5] For this seizure to be legal, the Deputies must have had a reasonable suspicion that Mr. Cannon was involved in some type of criminal activity. *United States v. Carter*, 360 F.3d 1235, 1240 (10th Cir. 2004) ("A brief detention is permissible if based on reasonable suspicion to believe that criminal activity may be afoot. Courts must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." (internal quotations and citations omitted)). Further, the Deputies were not permitted to detain Mr. Cannon any longer than necessary to confirm or dispel their suspicions. *United States v. Sharpe*, 470 U.S. 675, 686 (1985). In other words, even though the case of *Terry v. Ohio*, 392 U.S. 1 (1968), involved a frisk, a "*Terry* stop" need not involve a frisk. If there is no frisk, the minimum justification for the stop is reasonable suspicion of criminal activity, not reasonable suspicion that a suspect is armed and dangerous. Mr. Cannon's primary argument is that the Deputies lacked reasonable

---

[5] The United States argues that Mr. Cannon was not seized because he did not submit to the Deputies' show of authority. Doc. 41 at 9-10. Certainly Mr. Cannon was not submitting to authority *after* he fled into his apartment. But prior to his flight, the Deputies engaged the emergency lights on their marked car, Deputy Feist jogged to where Mr. Cannon was getting off of his scooter, and then asked to see his identification. She also informed him that she intended to frisk him. Doc. 59 at 131. In such a situation, no reasonable person would feel free to leave and Mr. Cannon did not leave. Instead, he submitted to the Deputies' authority by standing in front of his apartment and continuing to speak to them even though he wanted to enter his apartment. Indeed, had Mr. Cannon been free to leave all along, there could be no hot pursuit and the United States' asserted justification for a warrantless entry would evaporate.

suspicion to believe he was armed and dangerous, not that they lacked reasonable suspicion to briefly detain him.

I specifically find credible Detective Aragon's testimony at the hearing that he witnessed Mr. Cannon riding a motorized scooter on the sidewalk in violation of Albuquerque City Ordinance § 8-2-1-46.[6] *See* Doc. 59 at 22-23. I also find credible his testimony about Mr. Cannon's interaction with the driver of the green sedan and the subsequent interaction between another individual and the driver of the green sedan.[7] *Id.* at 46-47. Finally, I find credible Deputy Feist and Deputy Chavez's statements that both officers observed Mr. Cannon conduct a turn without signaling. *Id.* at 85 (Chavez); *id.* at 131 (Feist).  Based on these facts, when Deputies stopped Mr. Cannon they reasonably suspected he had illegally ridden his motor scooter on the sidewalk, had conducted a westbound turn without signaling within 100 feet of that turn, and had just engaged in a hand-to-hand drug transaction. Each of these suspected offenses provided an independent justification to briefly detain Mr. Cannon.

---

[6] In his Reply brief, Mr. Cannon argues that the Court should not credit Detective Aragon's testimony about riding the scooter on the sidewalk because the dashboard camera footage does not show this. Doc. 51 at 2 ("Notably, it is clear from the uniformed officers' dash camera video that Mr. Cannon did not drive his moped on the sidewalk.") The dashboard camera footage, however, comes from the car Deputy Chavez drove, not from Detective Aragon. Because Detective Chavez did not see Mr. Cannon ride on the sidewalk and his dashcam does not start until after Detective Aragon reported to Deputy Chavez that Mr. Cannon rode on the sidewalk, this incident could not have been captured on Deputy Chavez's dashcam.

[7] Mr. Cannon's investigator presented evidence at the hearing that, contrary to Detective Aragon's testimony that he saw Mr. Cannon go to another house, the owner of the house denied that Mr. Cannon had done so. Doc. 59 at 10-12. I neither credit nor discredit Detective Aragon's testimony regarding Mr. Cannon stopping by another house because, even assuming Mr. Cannon did briefly stop by someone else's house, this fact adds virtually nothing to the United States' probable cause argument. Further, although the rules of evidence do not apply at suppression hearings, I am not inclined to discredit a sworn first-hand account of a live witness in favor of unsworn hearsay testimony of a non-testifying individual who, had he been involved in a drug deal with Mr. Cannon, would have had an incentive to lie about that interaction.

Further, because the Deputies were legally detaining Mr. Cannon when they told him they intended to frisk him and because Mr. Cannon fled from the Deputies *before* they could frisk him, that the Deputies *intended* to frisk Mr. Cannon is irrelevant. *Ashcroft v. al-Kidd*, 563 U.S. 731, 736-37 (2011) (the Fourth Amendment "is predominantly an objective inquiry" and the Supreme Court has "almost uniformly rejected invitations to probe subjective intent" (internal quotation marks omitted)). Just as a seizure does not occur when the subject does not yield, *California v. Hodari D.*, 499 U.S. 621, 626 (1991), a *Terry* pat-down search does not occur when the subject does not permit himself to be searched. Moreover, the moment Mr. Cannon fled from the Deputies, he violated NMSA § 30-22-1 (resisting or evading). *See State v. Gutierrez*, 2007-NMSC-033, ¶ 31 ("While a person has the constitutional right to walk away from an officer who lacks reasonable suspicion and simply wants to question the person, a person who walks away from an officer attempting to detain that person based on reasonable suspicion can be charged with evading and eluding an officer under Section 30-22-1(B)."). Thus, after Mr. Cannon fled from the Deputies, the Deputies were justified in performing a search incident to arrest. In sum, the Deputies indisputably did not conduct a *Terry* pat-down and the Court should not issue an advisory opinion about whether such a pat-down would have been legal had the Deputies done it.

B.   <u>The Deputies did not illegally enter Mr. Cannon's curtilage to conduct their *Terry* stop.</u>

Mr. Cannon next argues that even if the Deputies had reasonable suspicion to stop him in a public place, they could not lawfully enter the curtilage of his home and seize him there, as he alleges they did. Doc. 51 at 1-2; Doc. 58 at 8. Again, although Mr. Cannon correctly cites the law, the law he cites does not apply to facts of his case. Had the Deputies followed Mr. Cannon onto the curtilage of his home and then detained him based on reasonable suspicion that he had committed a "nonserious" misdemeanor, they likely would have violated his constitutional

rights. *See infra*, pp. 14-15. The Deputies, however, did not enter the curtilage of Mr. Cannon's home during their *Terry* stop.

The area Mr. Cannon describes as the curtilage of his home is extremely small. He describes his curtilage as the small area between his front door and the sidewalk a few feet outside his front door. Doc. 59 at 164, 176; Hearing Def. Exhibits G, H, L & M. Whether this area constitutes curtilage is not clear and is not relevant. Deputies did not enter this area from the time they stopped Mr. Cannon until the time Mr. Cannon fled from them. Because the Deputies never entered this area before Mr. Cannon fled, whether this area is curtilage is irrelevant to the constitutionality of Mr. Cannon's pre-flight detention. And, after Mr. Cannon fled, the Deputies entered Mr. Cannon's *home* without a warrant; whether they passed through curtilage along the way is beside the point.

The video shows that the Deputies did not enter the area Mr. Cannon describes as his curtilage until Mr. Cannon fled from them. Instead, until Mr. Cannon fled, the Deputies stood no closer to Mr. Cannon's apartment than the sidewalk in front of his apartment that is also used as a pathway to other apartments in the complex. Doc. 59 at 101:3-12, 190:17-23, 192:20-21. The common area of an apartment complex is not curtilage connected to an individual apartment. *United States v. Dunn*, 480 U.S. 294, 304-05 (1987) (police officers are permitted to stand in an open field and observe the curtilage of a home when they do no more than any other member of the public might); *id.* at 304 ("[T]he term 'open fields' may include any unoccupied or undeveloped area outside of the curtilage. An open field need be neither 'open' nor a 'field' as those terms are used in common speech."). Because I find as a factual matter that, until Mr. Cannon fled, the Deputies did not enter the area of Mr. Cannon's home that he describes as his

curtiliage, I reject Mr. Cannon's argument that the Deputies conducted an unlawful *Terry* stop on the curtilage of his home.

 C. <u>Exigent circumstances do not exist to justify the Deputies' entrance into Mr. Cannon's home because there was no basis to suspect him of a "serious crime."</u>

 Mr. Cannon argues that the Deputies violated his Fourth Amendment rights when they entered his home to arrest him without a warrant. Doc. 39 at 11. The United States counters that the Deputies' warrantless entry was justified because they were in hot pursuit of Mr. Cannon. In its Response, the United States argued that the Deputies were justified in entering Mr. Cannon's home because they were in hot pursuit of Mr. Cannon and had probable cause to arrest him under NMSA § 30-22-1(D) for resisting an officer and refusing to comply with a lawful order. Doc. 41 at 11. Although the United States did not develop the argument, it also briefly asserted that the Deputies' entry was justified by the need to prevent the destruction of drug evidence. Doc. 41 at 14 ("Since there was also a need for the deputies to act quickly to prevent the destruction of drug evidence by the defendant, there was a true 'hot pursuit,' and thus a warrantless entry to make the arrest was justified.").

 At oral argument, I asked the United States whether probable cause existed to follow Mr. Cannon into his home to arrest him in connection with the suspected hand-to-hand drug transaction. Doc. 59 at 199. The United States stated that, although the Deputies had reasonable suspicion of drug trafficking, they did not have probable cause to arrest Mr. Cannon for drug trafficking. *Id*. Instead, the United States asserted they had probable cause to arrest him for resisting an officer. *Id*. I then asked the United States whether Deputies could enter Mr. Cannon's home to prevent him from destroying drugs when the Deputies did not even have probable cause to search Mr. Cannon for drugs in the first instance. *Id*. at 205.  I also noted that in *Mascorro v. Billings*, the Tenth Circuit held that chasing a fleeing suspect into his home to

arrest him for the misdemeanor crime of fleeing was not justified absent "articulated concerns about possible destruction of evidence" and asked the United States about the impact of this decision. Doc. 59 at 199 (quoting *Mascorro v. Billings*, 656 F.3d 1198, 1205 n.9 (2011)). Specifically, I asked whether the Deputies' concern about the destruction of evidence combined with Mr. Cannon's fleeing was sufficient to distinguish this case from *Mascorro*. *Id*. at 203-05. I then allowed the parties to submit supplemental briefing on this issue. *Id*. at 209.

In its supplemental brief, the United States reconsidered its statement regarding whether probable cause existed to enter Mr. Cannon's home to arrest him for a drug related crime. Doc. 57 at 2 n.2. Rather than pressing its original argument that the Deputies were justified in entering Mr. Cannon's home to arrest him for resisting an officer, the United States devoted its supplemental brief to arguing that probable cause existed to arrest Mr. Cannon for a drug-related crime and that the need to prevent the destruction of drug evidence created an exigency that justified the Deputies' warrantless entry.

Because the United States presented a new argument in its supplemental brief, I first address whether Mr. Cannon had a fair opportunity to respond to this argument. Although the United States filed its supplemental brief the same day as Mr. Cannon, Mr. Cannon's supplemental brief makes clear that he was aware of the shift in the United States' position before filing his brief. Doc. 58 at 11 ("In its supplemental argument, the government unexpectedly and surprisingly reversed course and argued for the first time that officers had probable cause to arrest Mr. Cannon for drug trafficking plus exigent circumstances to enter his home."). Further, in addressing the United States' new argument, Mr. Cannon justifiably filed a thirteen-page brief rather than restricting his brief to the five pages I allotted. In other words, both sides have fully briefed the extent of evidence related to whether Mr. Cannon was involved

13

in a drug-related crime. Because the United States has argued that probable cause for two separate types of crime (resisting arrest/fleeing and drug trafficking/possession) justifies the Deputies' entry into Mr. Cannon's home, I separately address arguments related to each.

Applicable to the analysis of both the United States' asserted justifications for the warrantless entry is the Supreme Court's restrictive guidance related to warrantless entries of homes. In *Payton v. New York*, the Supreme Court held that, "[i]n terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." 445 U.S. 573, 590 (1980) (emphasis added). "In no [setting] is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms." *Id.* at 589 (quoting U.S. Const. amend. IV). It is not clearly established whether police may conduct a warrantless entry to a home in hot pursuit of a suspect who an officer has probable cause to arrest for a misdemeanor. *Stanton v. Sims*, 571 U.S. 3 (2013).

Regardless of the specific justification the United States provides, "[w]hen analyzing warrantless arrests that begin outside the home and end with police chasing a suspect into his residence, we ask whether police had probable cause to make the arrest in the first place and then whether there were exigent circumstances to justify the officers' intrusion into the home." *United States v. Cruz*, 977 F.3d 998, 1004 (10th Cir. 2020). Two types of exigent circumstances the Tenth Circuit recognized in *Cruz* to justify the warrantless entry into a residence are: "(1) the destruction of evidence and (2) the hot pursuit of a suspect." *Id.* The United States relies on both doctrines in this case. Doc. 41 at 13-15; Doc. 57.

To determine whether the likelihood of destruction of evidence justifies a police officer's warrantless entry, the Tenth Circuit employs a four-part test. This test requires that an officer's entry be "(1) pursuant to clear evidence of probable cause, (2) available only for serious crimes and in circumstances where the destruction of the evidence is likely, (3) limited in scope to the minimum intrusion necessary to prevent the destruction of evidence, and (4) supported by clearly defined indicators of exigency that are not subject to police manipulation or abuse." *United States v. Aquino,* 836 F.2d 1268, 1272 (10th Cir. 1988). Similarly, the "hot pursuit" doctrine "permit[s] officers to enter a suspect's home without a warrant in pursuit of the suspect," but it also "must involve a serious offense coupled with the existence of an immediate and pressing concern such as destruction of evidence, officer or public safety, or the possibility of imminent escape." *Mascorro v. Billings*, 656 F.3d 1198, 1209 (2011).

The United States does not meet the first and second elements of the destruction-of-evidence test. Of these two elements, the United States' failure to show Mr. Cannon committed a "serious crime" for purposes of the second element is clearest. This same failure dooms the United States' hot pursuit argument, as the "hot pursuit" doctrine also requires police to be in pursuit of a "serious offense." Therefore, my analysis primarily focuses on why the United States has failed to show probable cause that Mr. Cannon had committed a serious crime at the time of the warrantless entry.

It is clear that the Deputies in this case had no legal authority to enter Mr. Cannon's home without a warrant to detain or arrest him simply for riding his scooter on a sidewalk or illegally conducting a turn without signaling, even if he was fleeing from a *Terry* stop. *Mascorro*, 656 F.3d at 1209-10 ("No reasonable officer would have thought pursuit . . . for a mere misdemeanor traffic offense constituted the sort of exigency permitting entry into a home without a

15

warrant.").[8] Nor does the United States argue otherwise. Therefore, I consider the two types of crimes the United States argues justify the warrantless entry in this case: (1) resisting and/or fleeing an officer and (2) drug trafficking or drug possession.

<u>Violation of NMSA § 30-22-1 for resisting an officer or fleeing an officer</u>

Resisting an officer or fleeing an officer in violation of NMSA § 30-22-1 is a misdemeanor offense. NMSA § 30-22-1. A misdemeanor offense carries a penalty of "imprisonment in excess of six months but less than one year." *Id.* § 31-1-2(K). Further, in measuring the seriousness of a misdemeanor, good reason exists to put the offenses of resisting or fleeing from an arrest toward the top of the list. Resisting or fleeing an arrest invites a level of physical escalation that all too frequently leads to tragic consequences—whether for the police officer or the suspect of a crime. Accordingly, I view the resisting or fleeing from an officer as a serious misdemeanor. As noted above, however, the Tenth Circuit in *Mascorro* made clear that police in hot pursuit of a suspect for misdemeanor traffic violations and who intend to arrest the suspect for fleeing from them cannot, without more, conduct a warrantless entry of that suspect's home. 656 F.3d at 1205 n.9.

In *Mascorro*, police attempted to stop a suspect for driving without taillights. *Id.* at 1202. Instead of yielding to police, however, the 17-year old suspect continued to drive to his parents' home, where he ran inside and hid. *Id.* Police entered the home without a warrant and arrested him. *Id.* In addressing whether the police officers legally entered the home, the Tenth Circuit noted the Supreme Court's admonition in *United States v. Santana*, 427 U.S. 38, 43 (1976), that

---

[8] Riding a motorized scooter on the sidewalk in violation of City Ordinance § 8-2-1-46 is a "petty misdemeanor and shall be punished by a fine of not more than $500 or by imprisonment for not more than 90 days." Abq. Ord. § 8-1-3-99(A). Failing to properly signal a right or left turn is a penalty assessment misdemeanor with a $25 fine. NMSA § 66-8-116(A).

"a suspect may not defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place." *Mascorro*, 656 F.3d at 1206.

The Tenth Circuit also noted, however, that this principle typically applies to felony arrests, not arrests for misdemeanors. *Id*. For instance, the Supreme Court in *Welsh v. Wisconsin* decided that police violated the Fourth Amendment when, without a warrant, they entered the home of a drunk driving suspect who had left his vehicle at the scene of an accident. *Mascorro*, 656 F.3d at 1206 (citing *Welsh v. Wisconsin*, 466 U.S. 740 (1984)). Although *Mascorro* recognized that the Supreme Court has not placed an outright ban on warrantless home arrests for certain minor offenses,[9] it recognized that the "nature of the underlying offense [is] an important consideration when determining the reasonableness of a warrantless entry." *Mascorro*, 656 F.3d at 1206.

Further, *Mascorro* noted "neither the Supreme Court nor this Court has ever found an entry into a person's home permissible based merely on the pursuit of a misdemeanant; additional circumstances have always dictated the result." *Id*. at 1209. The court described the circumstances in *Mascorro* as an arrest "for a traffic misdemeanor committed by a minor, with whom the officer was well acquainted, who had fled into his family home from which there was only one exit. The risk of flight or escape was somewhere between low and nonexistent. Moreover, there was no evidence which could have potentially been destroyed and there were no officer or public safety concerns. There is nothing to indicate the sort of 'real immediate and serious consequences' of postponing action to obtain a warrant required for a showing of exigent circumstances." *Id*. at 1208 (footnotes omitted). Significantly, *Mascorro* also concluded that,

---

[9] Indeed, the Supreme Court has specifically held that this point is not clearly established law in the context of a qualified immunity analysis. *Stanton v. Sims*, 571 U.S. 3 (2013).

even if probable cause existed to arrest the suspect for eluding a police officer, the crime "was a nonviolent misdemeanor raising no articulated concerns about possible destruction of evidence." *Id*. at 1205 n.9. Thus, Tenth Circuit concluded that "warrantless entry based on hot pursuit was not justified." *Id*. at 1208.

As in *Mascorro*, if the Deputies wanted to enter Mr. Cannon's house to arrest him for the misdemeanor offense of resisting/fleeing, they could have easily obtained a warrant. On observation of Mr. Cannon's apartment complex, it is quickly apparent that there is no back door and few windows in the small apartment through which Mr. Cannon could flee. Thus, under *Mascorro*, the Deputies could only justify entering Mr. Cannon's home if some exigency other than a desire to arrest him for fleeing or resisting existed.

At oral argument, I asked the United States if the Deputies' concerns that Mr. Cannon possessed drugs that he might try to destroy, combined with the Deputies' intent to arrest Mr. Cannon for resisting arrest, would suffice under *Mascorro*. Doc. 59 at 203-04. I further noted a weakness in such an argument is that, if the Deputies did not have probable cause to search Mr. Cannon for drugs, it is difficult to justify entering the apartment for the purpose of taking his drugs before he could destroy them. *Id.* at 204. I then invited the United States to brief this issue. *Id.* at 206.

In its supplemental brief, rather than continuing to attempt to justify the warrantless entry by the combination of hot pursuit to arrest Mr. Cannon for resisting arrest and concern that he might destroy drugs suspected to be in his possession, the United States argues that the Deputies had probable cause to arrest Mr. Cannon for felony drug trafficking and felony drug possession. Doc. 57. Thus, after I invited the United States to brief whether the Deputies' intention to arrest Mr. Cannon for resisting or fleeing could withstand *Mascorro*, the United States instead filed a

brief reversing its previous position and arguing that probable cause existed to arrest Mr. Cannon

for a felony drug offense. This shift evinces a recognition that a misdemeanor offense can

seldom, if ever, be used to justify a warrantless entry into a home. *See Welsh v. Wisconsin,* 466

U.S. 740, 750 (1984) ("When the government's interest is only to arrest for a minor offense, that

presumption of unreasonableness is difficult to rebut, and the government usually should be

allowed to make such arrests only with a warrant issued upon probable cause by a neutral and

detached magistrate." (footnote omitted)).

      Still, although *Mascorro* makes clear that police cannot conduct a legal warrantless entry

simply to arrest someone for the misdemeanor crime of fleeing, it left open the possibility that

the result might have been different had there been "concerns about possible destruction of

evidence." *Mascorro* 656 F.3d at 1205 n.9. As set forth below, I reject the government's

argument that police had evidence Mr. Cannon possessed anything more than personal use

amount of some type of drug. Therefore, I also reject the government's argument that the

Deputies were justified in pursuing Mr. Cannon into his home so that they could arrest him for

fleeing/resisting *and* prevent him from destroying some small amount of drugs they believed he

possessed. The next step in the analysis, then, is to consider the alternative argument the United

States makes in its supplemental brief: that probable cause to arrest for a felony drug offense

combined with concerns about the destruction of evidence justified the warrantless entry.

      <u>Drug trafficking and/or drug possession</u>

      In its supplemental brief, the United States argues that the Deputies had probable cause to

believe Mr. Cannon committed the felony offenses of drug trafficking and drug possession and

that their warrantless entry into his home was justified by their concern that he might destroy

drugs they suspected him of possessing. Doc. 57 at 2-4. The Tenth Circuit has held that police

officers who have probable cause to arrest a person for drug trafficking may legally follow a fleeing suspect into his home to arrest him and prevent him from destroying drugs, even if the police did not intend to arrest him until he began to flee. *United States v. Cruz*, 977 F.3d 998, 1006 (10th Cir. 2020).

The facts of the present case, however, are materially different from the facts in *Cruz*. First, unlike *Cruz*, where police entered a home to arrest a suspect for drug trafficking, the Deputies here initially arrested Mr. Cannon for resisting. Doc. 59 at 201. Although objective evidence, not the Deputies' subjective intent, dictates my recommendation, if probable cause existed to arrest Mr. Cannon for a felony drug offense, it is anomalous that the Deputies only arrested him for the misdemeanor offense of resisting arrest.

More importantly, the objective evidence, at best, supports probable cause that Mr. Cannon was involved in a *misdemeanor* drug crime. The evidence shows that Mr. Cannon approached a parked car, briefly placed his hand inside the car, and quickly left the scene. Detective Aragon "couldn't specifically see what was in anybody's hands." Doc. 59 at 67:10.[10] Evidence of this hand-to-hand drug transaction then later combined with evidence of Mr. Cannon's consciousness of guilt—a product of Mr. Cannon's decision to flee a lawful detention just before he was frisked. *See United States v. Martinez*, 681 F.2d 1248, 1259 (10th Cir. 1982)

---

[10] Detective Aragon later observed a second unidentified male, unconnected to this case, approach the sedan and engage in the same behavior. Doc. 59 at 46:1-7, 47:1-3. It is not clear that he obtained this information before he communicated with Deputies Chavez and Feist, and there is no evidence he communicated this information prior to the Deputies' arrest of Mr. Cannon. The parties have not briefed whether Detective Aragon's uncommunicated knowledge of the second hand-to-hand can be used to support probable cause for the actions of Deputies Feist and Chavez. The Court notes, however, that the Tenth Circuit has rejected "a rule that information known, individually, to officers is pooled (as if they were one sentient law-enforcing organism) even absent any evidence of communication." *United States v. Chavez*, 534 F.3d 1338, 1347 (10th Cir. 2008).

(flight from a lawful detention evinces consciousness of guilt).[11] Weighing on the other side of the probable cause balance, however, is that Detective Aragon never saw any drugs or money exchanged and an absence of evidence that these events occurred in a high crime area known for hand-to-hand drug transactions, that Mr. Cannon was previously known to the police in this case, or that the police had any previous reason to suspect Mr. Cannon or the driver of the sedan might be involved in drug activity.

Weighing the evidence, I conclude that the brief exchange with the driver of the sedan, combined with Mr. Cannon's flight from lawful detention when he thought he was about to be frisked, at least provide *reasonable suspicion* of drug activity. The question of whether *probable cause* existed to arrest Mr. Cannon for the *misdemeanor* offense of purchasing and possessing some type of drug is much closer. Probable cause does not exist, however, for the *felony* drug related crimes the United States argues justify the warrantless entry into Mr. Cannon's home.

Even if I considered the government's evidence that Mr. Cannon and another unknown individual engaged in hand-to-hand drug transactions, that would at most tend to show that the driver of the sedan was a drug trafficker. With respect to Mr. Cannon, it only tends to show that he was the purchaser of some small amount of drugs.[12] Although the United States asserts that probable cause exists that Mr. Cannon was trafficking drugs, it makes no argument and cites no evidence that Mr. Cannon intended to sell or otherwise distribute drugs to anyone else. As a

---

[11] Regardless of whether the frisk would have been legal had it happened, Mr. Cannon was lawfully detained at the time he fled, which provides evidence of consciousness of guilt.

[12] The government focuses its arguments on evidence against Mr. Cannon. It does not argue that the Deputies were justified in entering Mr. Cannon's home to prevent the destruction of evidence against the driver of the sedan.

result, I easily reject the government's argument that probable cause existed to believe that Mr.

Cannon was involved in drug trafficking.

Regarding possession, the United States argues that drug possession is a felony under

both federal and New Mexico law. Doc. 57 at 3. It asserts that heroin possession under New

Mexico law is a fourth-degree felony punishable by up to 18 months imprisonment and, under

federal law, is a felony with a maximum term of incarceration of 20 years for a first-time

offender. *Id*. at 3-4. Although the United States provides punishments related to heroin, it

provides no reason for Detective Aragon or the Deputies to suspect that Mr. Cannon purchased

heroin from the driver of the sedan. Even assuming probable cause existed to support a hand-to-

hand drug transaction, the drug purchased could just as easily have been marijuana, ecstasy,

oxycontin, or some other illegal drug.

Moreover, the United States is incorrect about the law. The text of NMSA § 30-31-23(E),

the legal authority the United States cites, states that an offense under that section is "a

misdemeanor and shall be punished by a fine of not less than five hundred dollars ($500) or more

than one thousand dollars ($1,000) or by imprisonment for a definite term less than one year, or

both." NMSA § 30-31-23(E). Nonetheless, the United States is correct that possession of heroin

is a fourth degree felony in New Mexico.[13] That possession of heroin is a felony under state law,

however, is only relevant if the Deputies had probable cause to believe Mr. Cannon possessed

heroin. Although police did find heroin in Mr. Cannon's possession when they arrested him, the

relevant question is whether police had probable cause to believe Mr. Cannon possessed heroin

as opposed to some other drug when they conducted a warrantless entry. And, again, the United

---

[13] The United States cites subsection E, but it is subsection F that governs felony convictions for possession of Schedule I narcotics such as heroin. NMSA § 30-31-6 (Schedule I); *id.* § 30-31-2(P) (definition of narcotic); *id.* § 30-31-23(F) (penalties for possession of Schedule I narcotics).

States provides no evidence or argument that, at the time of the warrantless entry, police had probable cause that Mr. Cannon possessed heroin. Because the United States presented no evidence to think it any more likely that the alleged hand-to-hand transaction involved heroin rather than some less serious drug such as marijuana, the Court should not assume the suspected hand-to-hand transaction involved a drug more serious than marijuana.

Looking to other sections of NMSA § 30-31-23, if Mr. Cannon had purchased less than a half ounce of marijuana he would face no jail time and if he purchased between a half ounce and an ounce, he would only face a maximum sentence of 15 days for a first offense. NMSA § 30-31-23(B)(1) and (2).[14] Because the United States presented no reason for the officers to suspect Mr. Cannon of having purchased heroin from the sedan driver, as opposed to another controlled substance such as marijuana, how New Mexico punishes possession of heroin is irrelevant.

Further, citing to 21 U.S.C. § 841, the United States asserts "first-time possession of heroin [is] a felony punishable by up to 20 years in prison." Doc. 57 at 3-4. But § 841 only punishes possession when that possession is combined with "intent to manufacture, distribute, or dispense." 21 U.S.C. § 841(a)(1). The United States has provided no evidence that Mr. Cannon intended to distribute or dispense the small amount of drugs Detective Aragon suspects he purchased from the driver of the sedan. *See* Doc. 59 at 74:22-75:3 (testimony of Detective Aragon that hand-to-hand drug transactions typically involve small quantities of drugs). Therefore, even assuming probable cause existed to charge Mr. Cannon with possession of a controlled substance, a first offense for simple possession is a misdemeanor under federal law. 21 U.S.C. § 844.

---

[14] In fact, New Mexico recently decriminalized recreational marijuana with commercial sales to begin no later than April of 2022.

The United States acknowledges that it "could not find a Tenth Circuit case deciding whether drug possession is a serious crime" for purpose of warrantless entry. Doc. 57 at 3. Nor does the United States cite a case from *any* jurisdiction where a court found a warrantless entry to be justified by the existence of probable cause for misdemeanor possession of drugs and suspicion that a suspect might destroy that misdemeanor amount of drugs.

Although I am unaware of Tenth Circuit precedent addressing the misdemeanor possession of drugs other than marijuana, in deciding whether possession of a small quantity of marijuana was a "serious crime" as required by *Aquino*, the Tenth Circuit concluded it was not. *United States v. Carter*, 360 F.3d 1235, 1242 (10th Cir. 2004); *see also United States v. Mongold*, 528 F. App'x 944, 949-951 (10th Cir. 2013) (unpublished) (where probable cause exists for marijuana possession, but not of any sort of drug trafficking, misdemeanor possession of marijuana is not a serious crime under the second prong of *Aquino*). Based on this precedent, I recommend concluding that the United States has not demonstrated probable cause existed to arrest Mr. Cannon for a serious crime at the time of the warrantless entry.

Failure at any of *Aquino*'s four prongs is fatal to the United States' argument and so the Court need go no further than finding the absence of a serious crime. Nonetheless, I also conclude that the United States has not established "clear evidence" of probable cause and, therefore, fails the first element of the *Aquino* test. If the Court does not consider the second hand-to-hand transaction, there is no probable cause of any drug crime. And, even taking into account the second hand-to-hand transaction, whether Detective Aragon and the Deputies had probable cause to believe Mr. Cannon possessed illegal narcotics is a close call. As such, "clear evidence" of probable cause is not present. Because the United States has failed to meet the first two prongs of the *Aquino* test, I reject their argument that concerns about the destruction of

24

evidence justified the Deputies' warrantless entry. Accordingly, I recommend suppressing all evidence in the case discovered after the police entered Mr. Cannon's home.

## II.  Motion to Suppress Statements (Doc. 40)

Although it is not necessary to rule on Mr. Cannon's motion to suppress statements if these same statements will be suppressed due to the unlawful warrantless entry into his home, I now consider this motion in case the Court disagrees with my conclusion that the warrantless entry into Mr. Cannon's home was unlawful. If the Court agrees with my above analysis and concludes the warrantless entry was lawful, I recommend denying as moot Mr. Cannon's motion to suppress statements he claims he made in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). Doc. 40.

Mr. Cannon moves to suppress two different statements: a statement made prior to the issuance of *Miranda* warnings, and a statement made after the issuance of *Miranda* warnings. I consider each in turn.

First, after the police officers took Mr. Cannon into custody, Deputy Chavez searched Mr. Cannon and seized a firearm from his pant pocket. Doc. 40 at 2. When he found the firearm, he commented: "Oh, look at this, a gun in his pocket." *Id.* at 3. In response, Mr. Cannon said, "No I took it from the youngster over there, man." *Id.* Mr. Cannon argues that "[t]his exchange was designed to elicit a response from Mr. Cannon and it occurred before Mr. Cannon was advised of his rights." *Id.* at 5. Mr. Cannon argues that he was in custody and that this comment from Deputy Chavez amounted to an interrogation, therefore *Miranda* applies. *Id.*

I disagree with Mr. Cannon. "The fact that a defendant is in custody . . . does not automatically render an exchange an interrogation. Rather, interrogation refers to either express questioning or its functional equivalent—i.e., words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably

likely to elicit an incriminating response from the suspect." *United States v. Cash*, 733 F.3d 1264, 1277 (10th Cir. 2013) (internal citations, alterations, and quotation marks omitted). Under an objective standard, Deputy Chavez was not interrogating Mr. Cannon. Any reasonable person would have understood the remark from the officer either as an alert for the other police officers regarding the presence of a firearm for purposes of officer safety or simply as a comment to other officers about what he found. No reasonable person in Mr. Cannon's position would have understood this as an interrogation. I therefore recommend denying the motion to suppress this statement.

Second, Mr. Cannon moves to suppress statements he made after Detective Aragon advised him of his *Miranda* rights. Detective Aragon asked:

> DETECTIVE ARAGON:  Do you understand each of these rights as I have explained to you?
>
> MR. CANNON:  Right.
>
> DETECTIVE ARAGON:  Yes or no?  Do you understand each of these rights as I have explained to you?
>
> MR. CANNON:  Yeah.
>
> DETECTIVE ARAGON:  Yeah?  Okay.  Having these rights in mind, do you wish to talk to us now?

Doc. 42-1 at 12. The parties dispute whether Mr. Cannon then replied "No," Doc. 40 at 3, or whether he then said, "Uh, yeah," Doc. 42-1 at 12. Detective Aragon then proceeded to question Mr. Cannon. Doc. 40 at 3.

Detective Aragon testified at the evidentiary hearing that Mr. Cannon stated "Yeah." Doc. 59 at 38:11-13, 48:1-4. Detective Aragon testified that if Mr. Cannon had said "No" or "Nah," Detective Aragon would not have interviewed him. *Id.* at 48:5-11. It appeared to Detective Aragon that Mr. Cannon was willing to speak to him after he read him his *Miranda*

rights. *Id.* at 9-11. In the recording of the conversation between Detective Aragon and Mr.

Cannon, it sounds to me as though Mr. Cannon responds "Ah, yeah" to Detective Aragon's

question. *See* Hearing Govt. Ex. 1 at 7:18. Mr. Cannon claims the quality of the recording is too

poor to determine what was said from the recording. Doc. 52 at 4. Although Mr. Cannon's

response is not clear, he definitely does not say "No" or "Nah." Furthermore, even if I were to

find the recording unclear, I find Detective Aragon's testimony credible. Accordingly, if the

Court chooses to address Mr. Cannon's motion to suppress evidence of his statements, I

recommend the Court find that Mr. Cannon explicitly waived his *Miranda* rights and his

statements should not be suppressed based on Mr. Cannon's argument that police violated those

rights.[15]

    Rather than ruling on Mr. Cannon's motion to suppress evidence, however, I recommend

denying that motion as moot. The Deputies' warrantless entry violated Mr. Cannon's Fourth

Amendment rights and his statements are a product of that violation. *United States v. Nava-

Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000) (the evidence sought to be suppressed is "fruit of

the poisonous tree" if there is "a factual nexus between the illegality and the challenged

evidence"). Therefore, I recommend suppressing his statements based on the warrantless entry. If

the Court agrees with this recommendation, the Court need not determine if those same

statements should also be suppressed as the result of a *Miranda* violation.

---

[15] Furthermore, when a suspect answers questions after a *Miranda* warning, even without
uttering the word "yeah," an implied waiver of *Miranda* rights occurs when there is also
evidence the suspect understood those rights. *Berghuis v. Thompkins*, 560 U.S. 370, 386-89
(2010). Thus, in circumstances similar to those in the present case, the Supreme Court declined
to suppress a suspect's statements even where the suspect never explicitly waived his *Miranda*
warnings. In the present case, however, the United States did not make a *Berghuis* argument and
so if the Court chooses to decide Mr. Cannon's *Miranda* motion, I recommend denying it on the
grounds I articulated in the body of this Report and Recommendation rather than under *Berghuis*.

## CONCLUSION

I recommend GRANTING Mr. Cannon's Motion To Suppress Evidence And Memorandum In Support Thereof, filed April 8, 2021 (Doc. 39), and DENYING AS MOOT Mr. Cannon's Motion To Suppress Statements And Memorandum In Support Thereof, filed April 8, 2021 (Doc. 40).

STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**